CITIZENS UTILITIES COMPANY OF ILLINOIS, Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Third District   No. 3—84—0088

Opinion filed August 31, 1984.

Daniel J. Kucera, of Chapman and Cutler, of Chicago, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Philip Willman, Assistant Attorney General, of counsel), for respondents.

JUSTICE HEIPLE delivered the opinion of the court:

On July 16, 1979, the Illinois Environmental Protection Agency (IEPA) filed a four-count complaint with the Pollution Control Board

(the Board) against Citizens Utilities Company of Illinois (Citizens) arising out of the operation of its West Suburban No. 1 sewage treatment plant in Bolingbrook. Count IV of the complaint charged Citizens with violating the operation and maintenance standards contained in its NPDES permit, Rule 601(a) of the Board relating to maintenance of facilities, and sections 12(a) and 12(f) of the Environmental Protection Act (Ill. Rev. Stat. 1981, ch. 111½, pars. 1012(a), (f)). After extensive hearings before the Board's hearing officer, the Board ordered, *inter alia*, a $1,000 penalty against Citizens pursuant to violations of its permit and the Board's rules alleged in count IV. It is from this penalty alone which Citizens appeals.

West Suburban No. 1 treats municipal waste, primarily from sewer connections located in Bolingbrook. The basic operation of the plant begins with the influx of the sewage into two primary tanks. Solids settle to the bottom of the tanks, while floating materials rise to the top. Wooden planks called flights are chain-driven along the bottom and top of the primary tanks. Settled solids, or sludge, are pushed along the bottom into hoppers for further treatment. The flights then rotate up to skim the surface and push scum to the end for removal. Sewage then flows into an aeration tank, where it is bubbled with air and metabolized by the biomass. From there the sewage flows into five secondary tanks, where flights similar to those in the primary tanks operate. Flow from the secondaries passes either to a polishing lagoon or a chlorine contact tank for disinfection prior to discharge to Lily Cache Creek. Any sludge removed from the primaries or secondaries is either transferred to aerobic digesters or returned to earlier stages for additional treatment.

Citizens was granted an NPDES permit to operate the plant and discharge wastewater by IEPA in 1975. The permit sets forth various limitations on the contents of effluents that Citizens is allowed to discharge. Primarily at issue here are the operation and maintenance standards set out in section 3 of the permit:

"3. *Facility Operation and Quality Control*

All waste collection, control, treatment and disposal facilities shall be operated consistent with the following:

(a) At all times, all facilities shall be operated as efficiently as possible and in a manner which will minimize upsets and discharges of excessive pollutants.

\* \* \*

(d) The permittee must provide optimum operation and maintenance of the existing waste treatment facility to produce as high a quality of effluent as possible."

Also applicable here are the Board's rules concerning operation and maintenance. Rule 601(a) provides:

> "All treatment works and associated facilities shall be so constructed and operated to minimize violations of applicable standards during such contingencies as flooding, adverse weather, power failure, or maintenance, through such measures as multiple units, holding tanks, duplicate power sources, or other such measures as may be appropriate."

On February 28, 1979, IEPA sent Jack Barnette, an emergency response specialist, to West Suburban No. 1 to conduct a compliance evaluation inspection. Barnette's report, which was admitted as an exhibit in the hearing before the Board, found that both primary tanks were out of service due to breaks in the chains that power the flights. One secondary tank was found to be out of service due to a broken flight. Barnette further observed what he believed to be sludge 600-700 feet downstream from the outfall pipe to Lily Cache Creek, although he could not testify with any degree of certainty that the alleged sludge emanated from the plant.

Further inspections were conducted on June 25 and July 2-3. The former was characterized as a "reconnaissance" inspection by Ted Denning, an engineer with IEPA and Barnette's supervisor. Denning accompanied Barnette on this inspection. Barnette alone inspected the plant on the latter dates. Numerous deficiencies were cited. At least one primary tank was still out of service. Scum removal was "poor." Solids were seen passing over the weirs in the secondary tanks. Excessive foam was observed in the aeration tank, and the chlorine tank was found to be "quite dark."

These observations were related in similar fashion at the hearings before the Board. On cross-examination, both Barnette and Denning based their conclusions of excessive scum, excessive foam, poor scum removal and a dark tank on their experience in inspecting other such facilities. While both recounted numerous ways in which the operation and maintenance deficiencies *might* cause the system to discharge an unacceptable quality of effluent, neither could testify with much certainty as to actual adverse environmental impact which could be causally related to system breakdown. Furthermore, both witnesses exhibited a certain degree of ignorance as to exactly what components were out of service at what times. Finally, neither witness seemed particularly familiar with how the plant actually functioned in the absence of the inoperative components.

At issue in this case is the liability of a permittee for alleged violations based upon mechanical breakdowns. The record is not entirely

clear as to the causes of the breakdowns, nor does it reflect any valid justifications for the failure to remedy these conditions promptly. However, it is our opinion that the testimony elicited does not suffice to sustain the penalty imposed by the Board.

■ While it is undoubtedly true that the operation and maintenance at West Suburban No. 1 was unsatisfactory in several respects, it does not follow that Citizens has violated its permit or the Board's rules. Close scrutiny of each of these standards reveals that the evidence presented was insufficient to support the conclusions of the Board.

Taking the permit first, it is apparent that the import of Conditions 3(a) and 3(d) is founded upon operation and maintenance to prevent water pollution. It is apparently the position of IEPA and the Board that unsatisfactory conditions which could potentially lead to water pollution are sufficient to premise violations upon. The problem with this position is that without reference to actual, resulting pollution, the conditions are too vague for rational enforcement. Use of such terms as "efficiently as possible" and "optimum operation and maintenance" without reference to the ability or inability of the plant to operate free of unacceptable discharges renders these standards meaningless.

The nature of the testimony given by IEPA witnesses Barnette and Denning illustrates the problem. Without referring to objective standards, both witnesses based their conclusions of faulty operation and maintenance upon visual observations and comparisons with other plants observed in the past. No reference to any objective standards regarding acceptable amounts of scum or sludge in the secondary clarifiers or chlorine contact tank is attempted. Furthermore, witness Denning's conclusions are based on the more or less hypothetical effects upon the effluent which may result from certain components being out of operation. However, nothing in either witness' testimony establishes a causal link between unsatisfactory operation and maintenance and any improper discharges into the creek.

■ Equipment failure is an unavoidable consequence of running a sophisticated operation such as West Suburban No. 1. However, without a substantial failure of any backup processes causing adverse environmental impact, equipment incapacity alone cannot serve as a basis for the violations charged.

IEPA attempts to avoid this problem by claiming that the result of such an interpretation would impose an impossible burden of proof. The response to this is that the burden is self-imposed. Had the Board rules or permit outlined unacceptable operation and maintenance

practices with any specificity (*e.g.*, setting minimum acceptable downtime for components or amounts of sludge or scum in the treatment process), then the process of proof would not be so arduous. However, by linking unacceptable operation and maintenance only to actual, resulting pollution, the IEPA has in effect forced itself to do the kind of "before breakdown-after breakdown" analysis of the plant's performance that it finds so burdensome.

IEPA cites *Mystik Tape v. Pollution Control Board* (1975), 60 Ill. 2d 330, 328 N.E.2d 5, for the proposition that violations for pollution can be imposed without specific standards being promulgated by the Board, as long as prohibited conduct is found. *Mystik Tape* is inapplicable. There was in fact a standard in this case, but proof of its violation was not forthcoming. The standard here is adverse environmental impact caused by unsatisfactory operation and maintenance. Assuming the "efficient operation" type of language to be sufficiently clear to be legally enforceable standing alone, a violation would have been appropriate were the standards not premised upon actual pollution caused.

*People v. Keeven* (1979), 68 Ill. App. 3d 91, 385 N.E.2d 804, is cited to show that actual pollution is not a condition precedent to the finding of a violation. *Keeven* is distinguishable in two respects. First, *Keeven* was an injunctive action to force a potential polluter to apply to the IEPA for various permits. Obviously, actual pollution could not be shown at that stage. Thus, the proceedings involved in this case are sufficiently different so as to render any connection dubious. Second, and more importantly, the asserted holding of *Keeven* is irrelevant to this case since there is a standard of actual pollution present here. The permit and Board rules are the sources of the very standards that IEPA asserts need not be met.

■ This court's opinion should not be taken as condonation of Citizens' conduct in this matter. It is clear that the conditions prevailing at West Suburban No. 1 were far from ideal for handling potential pollutants. However, the power of a government agency to impose violations must be carefully circumscribed where it seeks to enforce standards of its own creation. The speculative nature of the testimony put forth by the IEPA's witnesses is in itself support for careful review of violations based thereon.

For these and the foregoing reasons, the decision of the Pollution Control Board is reversed.

Reversed.

SCOTT and STOUDER, JJ., concur.